IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MIHAE YU, M.D.,<br><br>    Plaintiff,<br><br> vs.<br><br>QUEEN'S MEDICAL CENTER, ET AL.,<br><br>    Defendants. | Civ. No. 19-00258 JMS-KJM<br><br>ORDER DENYING PLAINTIFF'S SECOND MOTION FOR TEMPORARY RESTRAINING ORDER, ECF NO. 18 |

## ORDER DENYING PLAINTIFF'S SECOND MOTION FOR TEMPORARY RESTRAINING ORDER, ECF NO. 18

### I. INTRODUCTION

Plaintiff Mihae Yu, M.D. ("Plaintiff") has filed a "Second Motion for Temporary Restraining Order," ECF No. 18 (the "TRO Motion"), seeking to "enjoin the Defendants from continuing to suspend Plaintiff's hospital privileges at The Queen's Medical Center," pending the results of an internal due process hearing currently scheduled to begin January 27, 2020 pursuant to Section 10.7.3 of the Bylaws of the Medical Staff of The Queen's Medical Center ("Queen's"). ECF No. 18-5 at PageID #126. The court held a hearing on the TRO Motion on January 14, 2020, followed by supplemental briefing filed on January 16, 2020. Based on the following, the TRO Motion is DENIED.

## II. BACKGROUND

Plaintiff is a board-certified surgeon who has practiced surgery at Queen's for over thirty years, and is the Medical Director of the Surgical Critical Care Unit at Queen's. Verified Am. Compl. ¶ 12, ECF No. 16 at PageID #81; Yu Decl. ¶ 1, ECF No. 27-1 at PageID #775.

According to the Amended Complaint, Defendant Queen's is "a corporation duly organized and existing under the laws of the State of Hawaii and engaged in the provision of medical services" in Hawaii. ECF No. 16 at PageID #79. It alleges that Defendant Jason Chang is the President and Chief Operating Officer of Queens; Defendant Robb Ohtani, M.D., is chief of the medical staff at Queen's; Defendant Leslie Chun, M.D., is Vice President, Medical Staff Services, and Chief Quality Officer of Queen's; and Defendant Dean Mikami is a practicing physician at Queen's. *Id.* at PageID #79-80. Where appropriate, the court refers to Queen's, Chang, Ohtani, and Mikami collectively as "Defendants."

### A.    Proceedings Regarding Suspension of Plaintiff's Privileges

On June 6, 2018, the "Medical Executive Committee" ("MEC") of Queen's reviewed one of Plaintiff's surgical cases, and subsequently the MEC and the Professional Practice Evaluation Committee ("PPEC") of Queen's met to review other cases of Plaintiff. Plaintiff was apprised of these meetings and was

permitted to provide input regarding any matter under review. Ohtani Decl. ¶ 5, ECF No. 22-4 at PageID #280.

Apparently as a result of those then-ongoing MEC and PPEC proceedings, Plaintiff signed a letter on February 25, 2019 agreeing "to voluntarily refrain from exercising clinical privileges . . . until the [MEC] Meeting, scheduled for March 7, 2019." ECF No. 22-8 at PageID #377. After that MEC meeting, Plaintiff signed letters on March 8, 2019 and March 13, 2019, voluntarily agreeing to continue to refrain from exercising surgical privileges at Queen's, subject to certain exceptions for particular types of surgeries where she agreed to have a specified co-surgeon "present and scrubbed for the entirety of each case." ECF No. 22-9 at PageID #378. This agreement continued "until the final action(s) or recommendation(s) from the QMC Medical Staff's [MEC]." ECF No. 22-10 at PageID #379.

On May 13, 2019, Plaintiff filed suit in the First Circuit Court of the State of Hawaii ("state court"), seeking to enjoin Defendants (1) from suspending or limiting her privileges at Queen's and (2) from making reports concerning Plaintiff to the National Practitioners Data Bank. ECF No. 1-1 at PageID #12. Plaintiff filed a Motion for Temporary Restraining Order the next day, which the state court granted in part. ECF Nos. 22-2 & 22-3. The state court's TRO was limited to preventing Defendants from making reports to the National

Practitioner's Data Bank, but otherwise declined to enjoin suspension or limitation of Plaintiff's privileges.  ECF No. 22-3.

On May 20, 2019, Defendants removed the action to federal court under 28 U.S.C. § 1331, based on allegations that Defendants "have violated and will continue to violate Plaintiff's rights to due process of law guaranteed by Article I of the Constitution of the State of Hawaii and the First and Fourteenth Amendments to the Constitution of the United States."  ECF No. 1 at PageID #3.[1] And, after removal, the parties stipulated on June 4, 2019 that the state court's May 14, 2019 TRO would remain in effect "until final determination by the [Queen's] Board of Trustees after waiver or exhaustion of Plaintiff's procedural rights provided by the [Queen's'] Fair Hearing Plan or by further Order of this Court, unless otherwise vacated, modified or extended by agreement of the parties hereto."  ECF No. 9.

Meanwhile, on May 31, 2019, the MEC issued a "Notice of Adverse Recommendation Regarding Clinical Privileges," recommending restricting

---

[1] Plaintiff did not challenge that removal with a motion to remand, and at the January 14, 2020 hearing, Defendants' counsel also stated that they were not challenging jurisdiction, at least in these TRO proceedings.  Some authority indicates that Queen's is a "quasi-public" hospital under *Silver v. Castle Mem'l Hosp.*, 53 Haw. 475, 497 P.2d 564 (Haw. 1972) (discussing quasi-public hospitals for purposes of a physician's right to challenge credentialing decisions).  *See Pac. Radiation Oncology v. Queen's Med. Ctr.*, 861 F. Supp. 2d 1170, 1183 (D. Haw. 2012) (applying *Silver's* analysis to Queen's).  Whether Queen's acts "under color of state law" and what impact an answer to that question might have on subject-matter jurisdiction based on 42 U.S.C. § 1983 are not before the court, at least at this time.

Plaintiff's privileges similarly to the restrictions that were agreed to in March 2019—that is, allowing Plaintiff to perform certain procedures without a co-surgeon but requiring an approved co-surgeon for other listed procedures (and with complete restrictions for other designated procedures). *See* ECF No. 22-22 at PageID #572-76 (sealed). The notice informed Plaintiff she had the right, under the Bylaws of the Medical Staff of the Queen's Medical Center ("Bylaws"), to request a hearing on the recommendation. *Id.* at PageID #570. And, on June 13, 2019, Plaintiff requested such a due process hearing regarding the May 31, 2019 MEC recommendation. *See* Am. Verified Compl. ¶ 22, ECF No. 16 at PageID #83.

On September 19, 2019, Queen's issued Plaintiff a formal notification of hearing under the Bylaws regarding the MEC's May 31, 2019 recommendation. *See* ECF No. 22-12 at PageID #382. The notice set a hearing for October 21 to 23, 2019 before a panel led by Judge (ret.) Dan Foley. *Id.* at PageID #383. The hearing was later re-scheduled for December 10 to 12, 2019. *See* Heatherington Decl. ¶ 2, ECF No. 22-16; ECF No. 22-17.

At some point during this time frame, Plaintiff may have violated the restrictions on her privileges by operating alone, without another surgeon present as required for certain procedures. The Amended Complaint refers to a notification received by Plaintiff on November 14, 2019 about a proposed 31-day

suspension of privileges because she had operated alone for particular procedures on two patients, ECF No. 16 at PageID #83-84. Similarly, Queen's describes a November 7, 2019 MEC meeting recommending a 31-day suspension that would not become effective until after the pending due process hearing regarding the MEC's earlier May 31, 2019 recommendation. Ohtani Decl. ¶ 15, ECF No. 22-4 at PageID #282. In any event, Plaintiff was entitled to a hearing (which she requested) on this proposed 31-day suspension, and the parties agreed to combine that hearing with the then-pending December 2019 hearing regarding the May 31, 2019 MEC recommendation.

**B.     Proceedings Regarding Plaintiff's Reappointment Application**

Meanwhile, Plaintiff submitted an application for an extension or reappointment of her privileges, which were due to expire on November 8, 2019. According the Defendants, Plaintiff "submitted an incomplete application for reappointment on July 18, 2019," and "did not submit a completed application for reappointment until September 24, 2019, 46 days before her appointment term ended on November 8, 2019." Garrett Decl. ¶ ECF No. 35-3 at PageID #853-54. Under Bylaws § 3.5.8.2, "Applicants should submit a completed reappointment application at least ninety (90) days before the expiration of their current appointment." ECF No. 22-7 at PageID #326. On October 28, 2019, Plaintiff met

with a Queen's Credentialing Committee with respect to her reappointment application review.  ECF No. 22-4 ¶ 4, at PageID #282.

On November 7, 2019, the day before Plaintiff's privileges were to expire, the MEC recommended reappointment for a one-year term under current restrictions.  That is, the MEC essentially recommended the status quo for a one-year period—privileges with the restrictions set forth under the terms of the MEC's May 31, 2019 recommendation.  *See id.* ¶ 15, ECF No. 22-4 at PageID #282.  This recommendation, however, was apparently not final—the Bylaws appear to require final action by the Board of Trustees of Queen's (the "Board").  *See* ECF No. 22-7 at PageID #329 (Bylaws section 3.5.15.3 regarding actions by the Board after receiving the MEC's recommendation).  Such final action had not occurred by November 8, 2019.

In this regard, Plaintiff's Amended Complaint alleges that after November 8, 2019,

> Plaintiff was informed that her privileges had expired and that she could not practice or otherwise perform any medical treatments at Queen's despite the Bylaw provision for an automatic extension in such circumstances [apparently section 3.5.12.3] and the existence of a long-standing policy and practice of allowing physicians' (sic) to continue to practice at Queen's when final actions upon their applications for renewal have been delayed.

Am. Compl. ¶ 27, ECF No. 16 at PageID #84-85.[2]

After the MEC's November 7, 2019 recommendation, on November 14, 2019, the Queen's Quality and Patient Safety Committee ("QPSC") met and discussed Plaintiff's reappointment application and MEC's recommendation. The QPSC disagreed with the MEC and voted to recommend rejection of Plaintiff's reappointment. *See* Ohtani Decl. ¶ 16, ECF No. 22-4 at PageID #282. The two recommendations were then provided to the Board for review.

Meanwhile, on November 21, 2019, the parties agreed to continue the December 10, 2019 due process hearing until January 27 to 31, 2020. The

---

[2] Plaintiff contends that, under the Bylaws, if final action is not taken before expiration, then the current privileges are supposed to be "automatic[ally] extended." She points to Bylaw section 3.5.12.3, which reads:

> If, during the time applications for reappointment are being processed, a particular practitioner is being reviewed or investigated and the results will not be available to be considered before the end of the then current appointment period, the Credentials Committee shall recommend to the MEC that 1) the practitioner's current appointment and clinical privileges be continued (unless there is an immediate threat to patient safety which requires a suspension of all or part of the privileges) until a recommendation is forwarded and 2) action on the application be deferred until sufficient information is available to evaluate it. The practitioner will be informed by the Vice President of Medical Services (or designee) when the Board decides to continue a practitioner's appointment and clinical privileges pending resolutions of questions raised.

ECF No. 22-7 at PageID #328. Queen's responds by citing Bylaws § 3.5.8.3, which indicates "there may be an expiration of privileges prior to the reappointment," if an application is "submitted before the expiration of the current term, but not in time to allow sufficient review[.]" *Id.* at PageID #326.

continuance was apparently to accommodate Plaintiff's schedule "because Plaintiff

was a defendant in a medical malpractice case that was in trial at that time."

Hetherington Decl. ¶ 3, ECF No. 22-16 at PageID #514.

> The parties agreed that the January 27, 2020 hearing
> would be a consolidated hearing to address the MEC's
> May 31, 2019 recommended action to restrict Plaintiff's
> privileges, the recommended 31-day suspension *and*
> Queen's Board of Trustees action regarding Plaintiff's
> reappointment application.

*Id.* (emphasis added).

On December 9, 2019, Plaintiff's counsel wrote a letter to counsel for

Queen's, complaining about a lack of due process and an ongoing inability to see

or treat patients at Queen's since November 8, 2019. He wrote in part:

> Dr. Yu has been prevented from seeing or treating any of
> her patients at The Queens Medical Center since
> November 8, 2019, without a hearing and without any
> determination that she poses a risk of imminent harm. In
> effect, the privileges that Dr. Yu has held and exercised
> for several decades have been removed summarily
> through a tainted process after The Medical Executive
> Committee voted unanimously to renew Dr. Yu's
> privileges for one year with certain restrictions that are
> currently under review.

ECF No. 18-4 at PageID #116. The letter demanded reinstatement of privileges

immediately "in accordance with the most recent decision of the MEC." *Id.*

On December 11, 2019, counsel for Queen's responded, denying that

a due process violation had occurred. ECF No. 22-18 at PageID #518. Counsel

summarized the past proceedings—e.g., (1) the May 31, 2019 MEC recommendation, (2) the November 2019 recommendation to suspend privileges for 31 days for alleged violations of the restrictions on privileges, and (3) "any potential final action taken with respect to [Plaintiff's] application for reappointment," *id.*—all of which were to be part of the hearing set to begin on January 27, 2020. Counsel also contended that arguments regarding due process in the reappointment process were "premature since no final decision has been issued," pointing out that "[t]he authority to take final action with respect to [Plaintiff's] reappointment application rests with the Board." *Id.* at PageID #519. He indicated that he would follow up after a Board meeting on December 17, 2019. *Id.*

In this regard, an applicable Bylaw (section 3.5.15.4) regarding action on reappointment of privileges provides:

> If the Board considers modifying or rejecting a favorable action by the MEC and such modification or rejection would entitle the applicant to a hearing in accordance with the Fair Hearing Plan, the Board shall notify the applicant, through the Vice President, Medical Affairs, and shall take no final action until the applicant has waived or exhausted the procedural rights provided in the Fair Hearing Plan.

ECF No. 22-7 at PageID #329.

The Board met on December 17, 2019, and decided to reject the MEC's recommendation—that is, the Board accepted the QPSC recommendation and rejected Plaintiff's reappointment application. In addition to those recommendations, the Board considered substantial additional information regarding Plaintiff's professionalism and clinical concerns, as well as that a due process hearing was scheduled to begin on January 27, 2020 on all three matters—the May 31, 2019 MEC recommendation, the November 2019 31-day suspension, and the reappointment application. *See, e.g.*, Ex. A to Ing Decl., ECF No. 35-17 (sealed).

On December 18, 2019, the Board of Trustees issued a Notice of Adverse Action regarding Clinical Privileges, denying Plaintiff's reappointment application. ECF No. 18-3. The Notice was characterized as the Board's "final decision," concluding in part:

> While the MEC and Credentials Committee recommended approval of your reappointment application for one year (subject to a continuation of the restrictions communicated to you on May 31, 2019), QPSC disagreed with that recommendation and instead unanimously recommended denial of your reappointment on November 14, 2019. QPSC submitted its recommendation to the Board for final action, and the Board made a final decision to deny your reappointment to the medical staff on December 17, 2019, consistent with QPSC's recommendation.

*Id.* at PageID #114.  The Board also formally notified Plaintiff that she had the right to request a hearing regarding the decision within 30 days, with the understanding that the matter was already contemplated by the parties to be part of the upcoming January 27, 2020 proceedings.  *Id.* at PageID #115.

## C.    Procedural History in District Court

On January 7, 2020, Plaintiff filed a First Amended Verified Complaint for Declaratory Relief and Injunctive Relief and Damages.  ECF No. 16.  She also filed her "Second Motion for Temporary Restraining Order," ECF No. 18, which this court heard on January 14, 2020.  Following the hearing, the parties submitted supplemental memoranda on January 16, 2020.  ECF Nos. 34, 35.

## III.  <u>STANDARD OF REVIEW</u>

A temporary restraining order ("TRO") may issue only if a plaintiff meets her burden under well-established factors.  The standard for issuing a TRO is identical to the standard for issuing a preliminary injunction.  *See, e.g.*, *Hawaii v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1247 (D. Haw. 1999); *cf. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (observing that an analysis of a preliminary injunction is "substantially identical" to an analysis of a temporary restraining order).

A preliminary injunction is an extraordinary and drastic remedy never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). To obtain a preliminary injunction, a plaintiff "must establish that [plaintiff] is likely to succeed on the merits, that [plaintiff] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [plaintiff's] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As to the first factor, "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc*., 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)); *see also Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (reiterating the lesser "serious questions going to the merits" analysis). "The elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th

Cir. 2012).  All four elements must be established.  *DISH Network Corp. v. Fed.*

*Commc'n Comm'n*, 653 F.3d 771, 776 (9th Cir. 2011).[3]

## IV.  DISCUSSION

**A.     Likelihood of Success on the Merits of a Due Process Violation**

As the court indicated at the January 14, 2020 hearing, it appears that,

standing alone, Bylaw § 3.5.15.4 was violated.  There had been a "favorable

action" by the MEC on November 7, 2019 that recommended continuation of

Plaintiff's privileges as then-restricted for one-year (and with knowledge that a due

process hearing on those restrictions was scheduled).  The Board was considering

"modification or rejection" of that MEC action such that Plaintiff was entitled "to a

hearing in accordance with the Fair Hearing Plan."  Under Bylaw § 3.5.15.4, the

Board was to "notify the applicant . . . and shall take no final action until the

applicant has waived or exhausted the procedural rights provided in the Fair

Hearing Plan."  ECF No. 22-7 at PageID #329.  Nevertheless, on December 17,

---

[3] Defendants suggest that Plaintiff is actually seeking a mandatory injunction (which is subject to even higher standards), rather than a prohibitory injunction, that would go "well beyond simply maintaining the status quo."  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).  The court, however, applies standards for a prohibitory injunction—Plaintiff is in effect seeking the status quo as of November 7, 2019, where she was able to exercise privileges on a restricted basis.

2019, the Board made what it characterized as a "final decision" that denied

Plaintiff's reappointment application.[4]

But even if there was a violation of a Bylaw, the question before the

court is whether there is a likelihood of success on a *due process* violation. And

certainly not every violation of the Bylaws necessarily rises to a constitutional due

process violation. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) ("Due

process, unlike some legal rules, is not a technical conception with a fixed content

unrelated to time, place and circumstances. Due process is flexible and calls for

such procedural protections as the particular situation demands.") (internal

editorial marks and citations omitted); *Franceschi v. Yee*, 887 F.3d 927, 935 (9th

Cir. 2018) ("It is well-established that because due process is a flexible concept,

'[p]recisely what procedures the Due Process Clause requires in any given case is a

function of context.'") (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch.

Dist.*, 149 F.2d 971, 983 (9th Cir. 1998)).

On the one hand, considering the context—where all the parties

(including the Board) were operating under the assumption that the credentialing

---

[4] Defendants have not argued that there is a difference between a "final decision" and "final action" for purposes of the Bylaws. *Compare* Bylaws § 3.5.15.4 (referring to taking "no final action") *with* the December 18, 2019 Notice of Adverse Action (referring to the Board's "final decision"). In any event, from Plaintiff's perspective (and as the court views it), the Board's December 18, 2019 Notice was in fact a "final action" rejecting Plaintiff's reappointment, but subject to being changed after the due process hearing—it meant she had no privileges. Whether privileges could be *reinstated* is a different matter.

matters would be addressed at an already-scheduled due process hearing that had been continued at Plaintiff's behest—any "final action" the Board took on Plaintiff's reappointment application on December 17, 2019 was subject to ongoing procedural protections of Plaintiff's property interests.[5]  On the other hand, Bylaw § 3.5.15.4. is itself supposed to be providing the very process that is due.

Applicable case law indicates that, absent invocation of procedures for exigent circumstances or situations, a physician is entitled to a hearing prior to termination of privileges—not after.  *See, e.g.*, *Lew*, 754 F.2d at 1424 ("[W]e must determine whether Dr. Lew received an adequate procedural hearing before his property interest was terminated. '[W]hen a State seeks to terminate [a protected] interest . . . , it must afford "notice and opportunity for hearing appropriate to the nature of the case," *before* the termination becomes effective.'") (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 570 n.7 (1972)) (brackets and emphasis in original)); *Silver*, 53 Haw. at 572, 497 P.2d at 486 ("A final decision to revoke privileges or not reappoint, made by the ultimate governing body, the hospital

---

[5] No one disputes that a physician's existing privileges are a protected "property right" for purposes of a due process analysis.  *See, e.g.*, *Lew v. Kona Hosp.*, 754 F.2d 1420, 1424 (9th Cir. 1985); *Silver v. Castle Mem'l Hosp.*, 53 Haw. 475, 497 P.2d 564 (1972).

board, must come after the requisite hearing is provided."); *Blaine v. N. Brevard Cty. Hosp. Dist*., 312 F. Supp. 3d 1295, 1304 (M.D. Fla. 2018) (similar).

This case law clearly suggests that, because no procedures for summary termination or exigent circumstances appear to have been invoked, Defendants likely violated due process by terminating all of Plaintiff's privileges prior to the hearing scheduled to begin on January 27, 2020. Nevertheless, despite that inclination, the court need not make such a final declaration at this stage. Issuance of a TRO requires Plaintiff to prove all four *Winter* factors—and as analyzed to follow, even if Plaintiff succeeds on the first factor, she fails to satisfy the remaining *Winter* factors.

**B.     Irreparable Injury in the Absence of Preliminary Relief**

Plaintiff contends she will suffer irreparable injury to her practice, relations with her patients, and her reputation—harm that she claims cannot be remedied by monetary damages—if her privileges are not restored to their prior status (i.e., under restrictions in place on November 7, 2019). But much of the injury she describes might occur (or has already incurred) regardless of a continuation of the restrictions in place on November 7, 2019. The record also indicates that Plaintiff appears to have at least some "provisional" privileges at another institution, indicating that she could continue at least some of her practice, although not at Queen's. *See* ECF No. 35-14.

More importantly, as Defendants have argued, Plaintiff's claims of irreparable injury are belied by the delay that occurred in her seeking immediate injunctive relief. This delay suggests an absence of irreparable harm. *See, e.g.*, *Oakland Tribune, Inc. v. Chronicle Pub. Co*., 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.") (citations omitted) (addressing loss of reputation); *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) (similar); *Garcia v. Google, Inc*., 786 F.3d 733, 746 (9th Cir. 2015) (reasoning that plaintiff's own delay "undercut . . . claim of irreparable harm").

Here, the record indicates that Plaintiff did not submit a completed application for reappointment until September 24, 2019, when her existing privileges were to expire on November 8, 2019. And when final action regarding that application was not completed, and when her privileges then "expired" (wrongfully, according to Plaintiff), she took no immediate legal action to restore them. She also knew that on November 14, 2019, the QPSC had recommended—contrary to the MEC—denying the application. In effect, rather than seeking immediate relief to remedy an ongoing "irreparable injury," she appeared to be content to allow the process to run its course. And even after the notice of the Board's "final decision" on December 18, 2019 denying her reappointment

application, Plaintiff waited another three weeks until January 7, 2020 before filing the present TRO Motion—less than three weeks before the due process hearing was to begin. In the interim, she confirmed that the reappointment issues would be part of the due process hearing scheduled to begin on January 27, 2020, and participated in the pre-hearing processes for that hearing. *See* ECF No. 22-14 at PageID #413; ECF No. 22-16 at PageID #514; ECF No. 35-19 at PageID #871.

These circumstances all indicate a lack of irreparable injury that would be remedied by continuing the restricted privileges at Queen's in the interim. And plaintiff "must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1131. In short, Plaintiff fails to meet her burden to demonstrate irreparable injury in the absence of preliminary relief, especially considering that these issues will shortly be addressed at the upcoming due process hearing.

## C. Balance of Equities

Moreover, even assuming some ongoing harm to Plaintiff's patient relations and reputation, this injury is outweighed by injury to "patient care and order" that could occur if a TRO is granted. *See Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 707 (8th Cir. 2011) (affirming finding that balance of harms weighed in favor of medical facility where reinstatement would disrupt

"patient care and order").  The record (some of it submitted under seal, with court

approval, pursuant to Haw. Rev. Stat. § 624-25.5 as confidential peer review

records) establishes that Queen's would be harmed by immediate restoration of

Plaintiff's privileges to the status quo as of November 7, 2019.  *See, e.g.*, ECF No.

35-17.  The record provides specific indications of potential harm to Queen's if an

injunction is issued—evidence that supports conclusions in the Board's December

18, 2019 Notice regarding Plaintiff's performance and professionalism that could

distract medical staff from an appropriate focus on patient care.  In short, the

balance of equities tips in favor of Queen's.  Further, the Plaintiff's delay described

above in bringing this TRO Motion also factors into the equitable balance.

## D.    Public Interest

The last *Winter* factor also favors Queen's.  "In exercising their sound

discretion, courts of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of injunction."  *Winter*, 555

U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

"The public interest inquiry primarily addresses [the] impact on non-parties rather

than parties."  *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th

Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. at 22.

Even if, as Plaintiff asserts, she would provide needed surgical care to

patients, the record does not adequately establish that Plaintiff provides unique and

essential services that no one else can perform.  That is, Plaintiff has not established that depriving the public of her services would cause sufficient harm to require an immediate injunction.

And although the public has an interest in having Queen's strictly follow its Bylaws and provide due process to physicians, the public has a concomitant interest in optimizing patient care and safety.  The public has an interest in allowing Queen's to manage and control its affairs in a manner consistent with quality health care, considering not only a physician's skills, but all considerations that are entailed with credentialing decisions.  And the record here does not establish that an immediate injunction would benefit the public interest; if anything, it establishes that issuing the requested TRO could harm the public interest.

///

///

///

///

///

///

///

///

# V.  **CONCLUSION**

For the foregoing reasons, the court DENIES Plaintiff's Second Motion for TRO.  Even assuming Plaintiff could prevail on the first *Winter* factor (that is, a likelihood of success on the merits of a due process violation), the other *Winter* factors are not satisfied.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 21, 2020.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Yu v. Queen's Med. Ctr., et al.*, Civ. No. 19-00258 JMS-KJM, Order Denying Plaintiff's Second Motion for Temporary Restraining Order, ECF No. 18